# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### EASTERN DIVISION

_____

| | |
|---|---|
| ANDRIA RAINEY, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )     No. 20-1077-TMP |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
|     Defendant. | ) |
| | ) |

_____

## ORDER AFFIRMING THE COMMISSIONER'S DECISION
_____

On April 6, 2020, Andria Rainey filed a Complaint seeking judicial review of a social security decision.[1] (ECF No. 1.) Rainey seeks to appeal from a final decision of the Commissioner of Social Security ("Commissioner") determining that she did not qualify for benefits under Title II and Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-34. For the reasons below, the decision of the Commissioner is AFFIRMED.

## I.  BACKGROUND

On November 17, 2016, Rainey applied for Social Security Disability Insurance ("SSDI") benefits under Title II of the Act

_____

[1]After the parties consented to the jurisdiction of a United States magistrate judge on November 16, 2020, this case was referred to the undersigned to conduct all proceedings and order the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 17.)

and for Supplemental Security Income ("SSI") payments under Title XVI of the Act. (R. 10, 177-84, 185-92.) The applications, which alleged an onset date of May 10, 2016, were denied initially and on reconsideration. (R. 64-65, 92-93.) Rainey then requested a hearing, which was held before an Administrative Law Judge ("ALJ") on November 6, 2018. (R. 10, 576-620.)

After considering the record and the testimony given at the hearing, the ALJ used the five-step analysis to conclude that Rainey was not disabled from May 10, 2016 through the date of his decision, January 28, 2019.[2] (R. 10-22.) At the first step, the ALJ found that Rainey had not "engaged in substantial gainful activity since May 10, 2016, the alleged onset date." (R. 12.) At the second step, the ALJ concluded that Rainey suffers from the following severe impairments: mild degenerative disc disease of lumbar spine, depressive disorder, and anxiety disorder. (R. 12.) The ALJ also acknowledged that Rainey has been diagnosed with obesity but found that "her obesity does not have a further limiting effect upon her ability to perform basic work activities,

---

[2]The ALJ noted that regarding Rainey's claim for a period of disability and disability insurance benefits, Rainey's earnings records showed that she had acquired sufficient quarters of coverage to remain insured through December 31, 2020. (R. 10.) Accordingly, Rainey was required to establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits. (R. 10.)

and is therefore not severe." (R. 13.) The ALJ also commented that Rainey testified to being diagnosed with migraine headaches but did not allege any associated limitations. (R. 13.) The ALJ found her history of migraines to be nonsevere. (R. 13.)

At the third step, the ALJ concluded that Rainey's impairments do not meet or medically equal, either alone or in the aggregate, the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 13 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).) Accordingly, the ALJ had to then determine whether Rainey retained the residual functional capacity ("RFC") to perform past relevant work or could adjust to other work. The ALJ found that:

> [Rainey] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can lift, carry, push and pull 20 pounds occasionally, 10 pounds frequently, sit for 6 hours, stand and/or walk for 6 hours, and alternate sitting and standing or walking at 30-minute intervals, in an eight-hour workday. She should avoid climbing ladders and scaffolds. She can perform simple routine and moderately complex tasks but should not be expected to perform executive functions or critical analysis of data. (In essence, she can do unskilled and semi-skilled work). In addition to normal breaks, [Rainey] might be off task up to five percent of an eight-hour workday.

(R. 14-15.)

In reaching this RFC determination, the ALJ discussed

Rainey's testimony and the medical evidence in the record. The ALJ first described Rainey's complaints of "low back pain with radiculopathy down the left leg which began in 2008 or 2009, while working as a CNA." (R. 15.) The ALJ described the pain as being "exacerbated by activity" and stated that Rainey "treats conservatively with hot baths and Bio-Freeze three to four times a day." (R. 15.) The ALJ also acknowledged Rainey's complaints that her left knee "gives out" and "locks up," requiring her to lay down. (R. 15.) Additionally, the ALJ noted Rainey's complaints of neck pain beginning about a month prior to the administrative hearing. (R. 15.) The ALJ commented that the neck pain "radiates down [Rainey's] left arm, making her hand feel numb, and she has problems gripping and lifting things." (R. 15.) The ALJ then discussed Rainey's testimony that "she has suffered from anxiety since 2013" and that "[s]he cries and isolates in her room two days a week." (R. 15.) Rainey indicated that without medication, she feels nervous all the time. (R. 15.) The ALJ commented that Rainey also "report[ed] that she gets edema in her hands and feet when she uses them for long periods of time." (R. 15.) Rainey reported experiencing no side effects to her pain medications and muscle relaxers. (R. 15.)

The ALJ next discussed Rainey's testimony regarding her daily

activities, such as cooking, doing laundry, and grocery shopping. (R. 16.) The ALJ then stated that "[Rainey] indicates she can stand for 10 to 15 minutes at a time, walk for 10 to 15 minutes at a time, and sit for 10 to 15 minutes at a time, for a total of one to two hours of standing or walking, and one to one and a half-hour of sitting." (R. 16.) The ALJ noted that Rainey additionally stated that "[t]he rest of the time she takes breaks or lays down" and that "[s]he alternates sitting and standing." (R. 16.) Upon review of the evidence, the ALJ found that "[Rainey's] medically determinable impairments could reasonably be expected to cause the alleged symptoms," but determined that "[Rainey's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 16.)

The ALJ then moved on to a discussion of the medical evidence in the record, beginning with the consultative examinations by Donita Keown, M.D., and Dennis Wilson, Ph.D., conducted in February 2017. (R. 16.) The ALJ first described Dr. Keown's consultative examination on February 7, 2017, stating as follows:

> [Rainey] was first sent to a consultative physical exam, where she reported back pain from CNA work, and she reported imaging showed a bulging or herniated disc, but "[i]nterestingly, the origin of pain is specified by the claimant to be upper left flank about the posterior axillary line." [Rainey] also indicated pain was not

-5-

improved with pain management, water therapy or physical therapy, and she did not bring any medications to the exam (Exh. 1F, p. 1). Her physical exam was unremarkable, revealing negative straight leg raises, 5/5 strength in both hands, arms, and lower extremities, no sensory impairment, full range of motion throughout, and an unremarkable gait with no assistive device used. [Dr. Keown's] impression was left flank pain. Based on exam findings, Dr. Keown opined that [Rainey] could sit, stand, walk, lift, or carry without specific restriction or limitation (Exh. 1F, p. 2-3).

(R. 16, 281-83.) The ALJ then discussed Dr. Wilson's consultative examination on February 8, 2017, stating as follows:

At the consultative psychological evaluation the next day, [Rainey] indicated that she was currently not able to work because of "my back." "I can't stand for long periods of time" (Exh. 2F, p. 2). She indicated that "my back started messing up" when she worked as a CNA in 2009 or 2010, but here she reported she had treated with water therapy and physical therapy, and was unable to afford pain management. She reported currently having pain in her back and left leg (Exh. 2F, p. 3). As observed by the psychologist, she "ambulates normally and without apparent difficulty" (Exh. 2F, p. 4). [Rainey] described limited mental health treatment with "Ms. Maggie" whom she saw for a few months after her mother passed away in 2013, and then again when her son was born premature in December 2015, which "kicked in my anxiety and depression again so..." (Exh. 2F, p. 3). [Dr. Wilson] noted that she seemed to be "functioning in the average to low average range of overall intellectual ability," she seemed able to attend and concentrate reasonably well, and her immediate, recent, and remote memory was intact. She had no difficulty naming and remembering three objects in the office after five minutes and did serial 7s correctly and without counting on her fingers (Exh. 2F, p. 4). Dr. Wilson also observed that [Rainey's] verbal skills, communication skills, and social skills were good and her activity level was within normal limits. There was no indication of suicidal or homicidal ideation, plan, or intent, but [Rainey] was

> tearful at times and reported guilt feelings, crying
> episodes, and difficulty with concentration and memory.
> She described her daily activities as "sitting at home
> with my 1-year-old son, cooking and cleaning." She noted
> that on a "good day," she does not have any bouts of
> crying, and on a "bad day," she cries all day, though
> she could not say why. Her mood was dysthymic and she
> also seemed anxious and tense (Exh. 2F, pp. 5-6). Based
> on his interview, observations, and mental status exam,
> Dr. Wilson opined that the claimant has "chronic
> depression and anxiety apparently exacerbated by recent
> childbirth and reported ongoing physical health
> problems." He diagnosed major depressive disorder,
> recurrent, moderate, and generalized anxiety disorder,
> and assessed no more than mild to moderate functional
> limitations (Exh. 2F, p. 6).

(R. 16-17, 285-90.)

The ALJ noted that the records from the consultative exams of Dr. Keown and Dr. Wilson were the only medical records available when the state agency consultants reviewed the record in early 2017. (R. 16.) Regarding the assessments of the state agency consultants, the ALJ stated as follows:

> Based on the limited medical evidence of record, state
> agency medical and psychological consultants providing
> review in March and May 2017, assessed [Rainey] to have
> no severe physical impairment, and mental impairments of
> depression and anxiety causing no more than moderate
> limitations in one or more domains (Exh. lA, 2A, 5A,
> 6A). Notably, the initial psychological assessment noted
> no limitations with understanding and memory, but
> moderate limitations in the other areas (*see, e.g.*, Exh.
> 2A, pp. 8-10), and on reconsideration, there were no
> limitations in any area except concentration,
> persistence or pace (*see, e.g.*, Exh. 6A, pp. 9-10).

(R. 17, 40-63, 66-91.) The ALJ additionally noted that "[t]he

psychological assessment on reconsideration appears much more consistent with the record as a whole, including medical records submitted thereafter." (R. 17.)

The ALJ stated that based on treatment records from Rainey's therapist, on August 30, 2016, Rainey indicated that her symptoms caused only a "minor problem." (R. 17, 313.) The ALJ noted that Rainey's therapist, a licensed clinical social worker, indicated that Rainey reported depression and anxiety for a long period of time with increased symptoms for approximately two weeks prior to the visit in August 2016. (R. 17, 310-11.) The therapist assessed a persistent depressive disorder of moderate severity. (R. 17, 310-11.) In a treatment record from September 2016, the therapist indicated "moderate progress toward treatment goals to decrease and anxiety." (R. 17, 309.) The ALJ then stated that "[f]rom October 2016 through November 2017, the therapist consistently assessed persistent depressive disorder of mild or mild-moderate severity, with anxious distress, and symptoms adequately controlled with medication." (R. 17-18, 296-308.) On August 30, 2017, Rainey informed the therapist that she was "trying to get disability [due to] back issues." (R. 18, 299.) The ALJ commented that the record includes no further treatment or follow up for anxiety or depression after November 2017. (R. 18.) In addition,

the ALJ noted that "[Rainey] submitted function reports in which she continued to assert primarily physical complaints, alleging her back and legs hurt, while she was able to care for four children, prepare meals, drive, grocery shop, and go to church on a regular basis." (R. 18, 222-29, 242-49.)

The ALJ then explained that the medical evidence in the record provided limited support for Rainey's claim, pointing first to an MRI of her lumbar spine in June 2018. (R. 18.) The MRI, noting comparison with a prior study in October 2014, demonstrated "[m]ild degenerative disc disease without significant change." (R. 18, 295, 565.) The MRI report described findings of disc space narrowing at L5 with mild bulging of the disc and mild degenerative spurring, and disc protrusion at L4 which was present previously. (R. 18, 295, 565.) In addition, the MRI report indicated no significant central or foraminal stenosis at any level. (R. 18, 295, 565.) The ALJ commented that such "[a]n MRI report describing 'mild' degenerative disc disease does not tend to suggest pain or symptoms of a disabling level of severity." (R. 18.)

The ALJ then discussed primary care records from Rainey's treating physician, Beryl Yancey-Allen, M.D., which included complaints of low back pain and left leg pain in October 2014. (R. 18, 538-39.) The ALJ commented that the treatment records "describe

limited findings on cursory exams of the lumbosacral spine, i.e.,
'spasms and swelling especially on the left side.'" (R. 18, 538.)
The spasms and swelling were noted on Dr. Yancey's treatment
records through September 15, 2015. (R. 528-39.) No spasms or
swelling were recorded in treatment records from January 2016. (R.
527-28.) On March 28, 2016, Dr. Yancey recorded an observation of
"spasms" upon examination of the lower back. (R. 18, 525-26.) Dr.
Yancey continued to record observations of lower back "spasms"
through August 2018. (R. 496-526.) In June 2018, Dr. Yancey
discussed MRI results indicating mild degenerative disc disease.
(R. 18, 499.) The ALJ then described the opinion rendered by Dr.
Yancey in October 2018, stating as follows:

> In a medical source statement dated October 22, 2018,
> Dr. Yancey offers "less than sedentary" exertional
> limitations, and for support, [Dr. Yancey] refers to the
> MRI report as showing a "bulging disc" at L4-L5 (Exh.
> 8F), when the MRI report indicates an impression of "Mild
> degenerative disc disease without significant change"
> since a prior study in October 2014, and with no
> indication of impingement of the neural spinal canal
> (Exh. 3F; Exh. 7F, p. 75). In essence, Dr. Yancey's
> medical source statement appears to be based on a
> subjective report of limitations rather than any
> objective clinical findings. Neither the "mild
> degenerative disc disease" described on the MRI report,
> nor "spasms" on cursory exams in the primary care record,
> nor any other medical evidence of record, supports the
> degree of limitations offered by the doctor.

(R. 19, 570-74.)

The ALJ then described hospital records showing emergency

room visits, including visits for back pain in September 2016 and
April 2017. (R. 19, 394, 418.) The ALJ emphasized that during
emergency room visits in February 2016, May 2016, September 2016,
April 2017, and July 2017, Rainey consistently had normal range of
motion, normal strength, and no tenderness or swelling on
musculoskeletal exam, even during visits regarding her complaints
of back pain. (R. 19, 336, 364, 390, 413, 438.) Records from Fast
Pace Urgent Care Clinic in August 2017 indicated swelling in the
left lumbar area. (R. 19, 323.) On a subsequent visit in December
2017, a physical examination indicated normal back range of motion,
normal gait and posture, intact lower extremity sensation
bilaterally, normal reflexes, normal mood and affect, and normal
cognitive functioning. (R. 19, 314-15.) The ALJ additionally noted
that Dr. Yancey prescribed physical therapy in July 2018, but
Rainey was discharged after failing to appear for any visits after
her initial evaluation. (R. 19, 482-90, 569.)

The ALJ then assigned weight to each of the medial opinions
discussed above. The ALJ gave "moderate weight" to the opinion of
Dr. Keown. (R. 20.) The ALJ noted that Dr. Keown assessed "no
functional limitations" consistent with the examination results
and the other evidence in the record, such as Dr. Keown's
observation that Rainey "ambulates normally and without apparent

difficulty." (R. 20.) The ALJ gave "little weight" to the assessments of the state agency medical consultants, which indicated "no severe physical impairment," because the ALJ found Rainey's history of back pain demonstrated throughout her treatment records supported a finding of a severe impairment. (R. 20.) The ALJ also gave "little weight" to the opinion of Rainey's treating physician, Dr. Yancey, stating as follows:

> Dr. Yancey's opinion is not well supported or consistent with any medical evidence of record, and is also given little weight. However, her opinion that, due to problems with pain while working, the claimant has problems focusing (Exh. 8F, p. 3), is accepted to the extent that the undersigned has incorporated a limitation that considers that the claimant may be off task up to five percent of an eight-hour workday.

(R. 20.)

The ALJ gave "only partial to moderate weight" to the opinion of Dr. Wilson, stating that "he appeared to give substantial weight to [Rainey's] subjective reporting that was not entirely consistent (e.g. noting she had good social skills but seemed somewhat impaired with social activities)." (R. 20.) The ALJ gave "[l]ittle to partial weight" to the assessments by the state agency psychological consultants regarding Rainey's mental limitations. (R. 20.) The ALJ noted that the May 2017 assessment was entitled to more weight, "assessing no limitations except with concentration, persistence or pace (see, e.g., Exh. 6A, pp. 9-

-12-

10)." (R. 20.) The ALJ deemed the May 2017 assessment to be "more consistent with the record as a whole," and commented that it "supports the established residual functional capacity." (R. 20.)

The ALJ concluded that although the record "establishes underlying medical conditions capable of producing some pain and other limitations," it "does not confirm disabling pain or limitations arising from [Rainey's] underlying medical conditions, nor does it support a conclusion that the objectively determined medical conditions are of such a severity that they could reasonably be expected to give rise to disabling pain and other limitations." (R. 20.) The ALJ determined that Rainey's allegations and testimony as to limitations more severe than that of the ALJ's assessment of her RFC are not consistent with the record when considered in its entirety. (R. 20.)

Proceeding to step four, the ALJ found that Rainey "is unable to perform any past relevant work." (R. 20.) In making this determination, the ALJ relied on hearing testimony from vocational expert Julia Russell, Ph.D., regarding Rainey's past relevant work as a certified nurse assistant, which Rainey performed as heavy work, and as a cashier, which Rainey performed as medium work. (R. 20, 576-620.) According to the ALJ, "this work was performed as substantial gainful activity, long enough to learn, and within the

-13-

relevant period (*see*, *e.g.*, Exh. 3D, 3E, 16E; Exh. 2E, p. 3)." (R. 20.) In response to a hypothetical question from the ALJ, the vocational expert testified that an individual with the same age, education, past work, and RFC as Rainey could not perform the past relevant work. (R. 20-21, 576-620.) The ALJ accepted the vocational expert's testimony and found that the demands of Rainey's past relevant work exceed her RFC. (R. 21.)

At step five, the ALJ again relied on the vocational expert's testimony in finding that "there are jobs that exist in significant numbers in the national economy that [Rainey] can perform." (R. 21.) The ALJ noted that Rainey was twenty-eight years old on the alleged disability onset date and has at least a high school education. (R. 21.) The ALJ additionally commented that "[i]f [Rainey] had the residual functional capacity to perform the full range of light work, a finding of 'not disabled' would be directed by Medical-Vocational Rule 202.21. However, [Rainey's] ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations." (R. 21.) Accordingly, the ALJ turned to the vocational expert "[t]o determine the extent to which [Rainey's] limitations erode the unskilled light occupational base." (R. 21.)

The ALJ stated that the vocational expert, when asked "whether

-14-

jobs exist in the national economy for an individual with [Rainey's] age, education, work experience, and residual functional capacity," testified that "given all of these factors the individual would be able to perform the requirements of representative occupations such as mail sorter (DOT# 222.687-022, light, SVP 2), 24,000 jobs in the national economy; bakery worker, conveyor line (DOT #524.687-022, light, SVP 2), 21,000 jobs in the national economy; and blending-tank tender helper (DOT #520.687-066, light, SVP 2), 7,000 jobs in the national economy." (R. 21-22, 576-620.) Determining that the vocational expert's testimony was reliable and consistent with the information contained in the Dictionary of Occupational Titles, the ALJ concluded as follows:

> Based on the testimony of the vocational expert, the undersigned concludes that, considering [Rainey's] age, education, work experience, and residual functional capacity, [Rainey] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.

(R. 22.) Accordingly, the ALJ determined that Rainey had not been under a disability, as defined by the Act, from May 10, 2016 through the date of his decision. (R. 22.)

On January 28, 2019, the ALJ issued a decision detailing the findings summarized above. (R. 10-22.) On February 5, 2020, the SSA Appeals Council denied Rainey's request for review of the ALJ's decision. (R. 1-3.) Rainey now seeks judicial review of the ALJ's

decision, which stands as the final decision of the Commissioner under § 1631(c)(3) of the Act. On appeal, Rainey argues that the ALJ failed to properly weigh the medical opinion evidence in the record.

## II.   ANALYSIS

### A.   Standard of Review

Under 42 U.S.C. § 405(g), a claimant may obtain judicial review of any final decision made by the Commissioner after a hearing to which he or she was a party. "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Judicial review of the Commissioner's decision is limited to whether there is substantial evidence to support the decision and whether the Commissioner used the proper legal criteria in making the decision. Id.; Cardew v. Comm'r of Soc. Sec., 896 F.3d 742, 745 (6th Cir. 2018); Cole v. Astrue, 661 F.3d 931, 937 (6th Cir. 2011); Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is more than a scintilla of evidence but less than a preponderance, and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Kirk v. Sec'y of Health &

Human Servs., 667 F.2d 524, 535 (6th Cir. 1981) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

In determining whether substantial evidence exists, the reviewing court must examine the evidence in the record as a whole and "must 'take into account whatever in the record fairly detracts from its weight.'" Abbott v. Sullivan, 905 F.2d 918, 923 (6th Cir. 1990) (quoting Garner v. Heckler, 745 F.2d 383, 388 (6th Cir. 1984)). If substantial evidence is found to support the Commissioner's decision, however, the court must affirm that decision and "may not even inquire whether the record could support a decision the other way." Barker v. Shalala, 40 F.3d 789, 794 (6th Cir. 1994) (quoting Smith v. Sec'y of Health & Human Servs., 893 F.2d 106, 108 (6th Cir. 1989)). Similarly, the court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. Ulman v. Comm'r of Soc. Sec., 693 F.3d 709, 713 (6th Cir. 2012) (citing Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007)). Rather, the Commissioner, not the court, is charged with the duty to weigh the evidence, to make credibility determinations, and to resolve material conflicts in the testimony. Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 528 (6th Cir. 1997); Crum v. Sullivan, 921 F.2d 642, 644 (6th Cir. 1990).

**B.   The Five-Step Analysis**

-17-

The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1). Additionally, section 423(d)(2) of the Act states that:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

Under the Act, the claimant bears the ultimate burden of establishing an entitlement to benefits. Oliver v. Comm'r of Soc. Sec., 415 F. App'x 681, 682 (6th Cir. 2011). The initial burden is on the claimant to prove she has a disability as defined by the Act. Siebert v. Comm'r of Soc. Sec., 105 F. App'x 744, 746 (6th Cir. 2004) (citing Walters, 127 F.3d at 529); see also Born v. Sec'y of Health & Human Servs., 923 F.2d 1168, 1173 (6th Cir. 1990). If the claimant is able to do so, the burden then shifts to

the Commissioner to demonstrate the existence of available employment compatible with the claimant's disability and background. Born, 923 F.2d at 1173; see also Griffith v. Comm'r of Soc. Sec., 582 F. App'x 555, 559 (6th Cir. 2014).

Entitlement to social security benefits is determined by a five-step sequential analysis set forth in the Social Security Regulations. See 20 C.F.R. §§ 404.1520 & 416.920. First, the claimant must not be engaged in substantial gainful activity. See 20 C.F.R. §§ 404.1520(b) & 416.920(b). Second, a finding must be made that the claimant suffers from a severe impairment. 20 C.F.R. §§ 404.1520(a)(4)(ii) & 416.920(a)(5)(ii). In the third step, the ALJ determines whether the impairment meets or equals the severity criteria set forth in the Listing of Impairments contained in the Social Security Regulations. See 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526. If the impairment satisfies the criteria for a listed impairment, the claimant is considered to be disabled. On the other hand, if the claimant's impairment does not meet or equal a listed impairment, the ALJ must undertake the fourth step in the analysis and determine whether the claimant has the RFC to return to any past relevant work. See 20 C.F.R. §§ 404.1520(a)(4)(iv) & 404.1520(e). If the ALJ determines that the claimant can return to past relevant work, then a finding of not disabled must be entered.

Id. If the ALJ finds the claimant unable to perform past relevant work, however, the ALJ must determine at the fifth step whether the claimant can perform other work existing in significant numbers in the national economy. See 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g)(1), 416.960(c)(1)-(2). Further review is not necessary if it is determined that an individual is not disabled at any point in this sequential analysis. 20 C.F.R. § 404.1520(a)(4).

## C.  Medical Opinion Evidence

Rainey argues that the ALJ did not follow applicable regulations when determining her RFC and that the ALJ's RFC determination was not supported by substantial evidence. As an initial matter, because Rainey applied for benefits in November 2016, the ALJ's evaluation of medical opinion evidence is governed by 20 C.F.R. §§ 404.1527 & 416.927.[3]

---

[3]For claims filed on or after March 27, 2017, 20 C.F.R. §§ 404.1520c & 416.920c apply. The application of these provisions would "eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion." Lester v. Saul, No. 5:20CV1364, 2020 WL 8093313, at *10 (N.D. Ohio, Dec. 11, 2020), report and recommendation adopted, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021) (quoting Ryan L.F. v. Comm'r of Soc. Sec., No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019)); see also Jones v. Berryhill, 392 F. Supp. 3d 831, 839 (E.D. Tenn. 2019) ("Because Plaintiff filed his application for benefits after March 27, 2017, his claim was not subject to the treating physician rule[.]"). However, because Rainey applied for benefits in November 2016, the ALJ was required to adhere to the requirements of 20 C.F.R. §§ 404.1527 & 416.927 in evaluating the medical opinion evidence in the record.

When an ALJ formulates an RFC finding, "the ALJ evaluates all relevant medical and other evidence and considers what weight to assign to treating, consultative, and examining physicians' opinions." Eslinger v. Comm'r of Soc. Sec., 476 F. App'x 618, 621 (6th Cir. 2012) (citing 20 C.F.R. § 404.1545(a)(3)); see also Ealy v. Comm'r of Soc. Sec., 594 F.3d 504, 514 (6th Cir. 2010). The Sixth Circuit has stated that:

> [a]n opinion from a treating physician is "accorded the most deference by the SSA" because of the "ongoing treatment relationship" between the patient and the opining physician. A nontreating source, who physically examines the patient "but does not have, or did not have an ongoing treatment relationship with" the patient, falls next along the continuum. A nonexamining source, who provides an opinion based solely on review of the patient's existing medical records, is afforded the least deference.

Norris v. Comm'r of Soc. Sec., 461 F. App'x 433, 439 (6th Cir. 2012) (quoting Smith v. Comm'r of Soc. Sec., 482 F.3d 873, 875 (6th Cir. 2007)) (internal citations omitted). A treating source's opinion is due controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2); see also 20 C.F.R. § 416.927(c)(2); Turk v. Comm'r of Soc. Sec., 647 F. App'x 638, 640 (6th Cir. 2016).

If the ALJ discounts the weight normally given to a treating source opinion, the ALJ must explain his or her decision. 20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2). "Where an ALJ does not give controlling weight to a treating source opinion, [he or she] weighs that opinion in light of the regulations, using the factors in 20 C.F.R. § 404.1527(c)(2)-(6)." Perry v. Comm'r of Soc. Sec., 734 F. App'x 335, 339 (6th Cir. 2018); see also 20 C.F.R. § 416.927(c)(2)-(6). "This does not require an 'exhaustive, step-by-step analysis,' but merely 'good reasons' for the ALJ's weighing of the opinion." Perry, 734 F. App'x at 339 (quoting Biestek v. Comm'r of Soc. Sec., 880 F.3d 778, 785 (6th Cir. 2017)). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" Dugan v. Comm'r of Soc. Sec., 742 F. App'x 897, 902-03 (6th Cir. 2018) (quoting Gayheart v. Comm'r of Soc. Sec., 710 F.3d 365, 376 (6th Cir. 2013). The relevant factors are: "the length, nature, and extent of the treatment relationship; the supportability of the physician's opinion and the opinion's consistency with the rest of the record; and the physician's specialization." Steagall v. Comm'r of Soc.

Sec., 596 F. App'x 377, 380 (6th Cir. 2015) (citing Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004)).

Rainey argues that the ALJ erred in affording little weight to the opinion of her treating physician, Dr. Yancey, from October 2018. The ALJ found that Dr. Yancey's opinion was not well supported or consistent with the objective medical evidence in the record. (R. 19-20.) Accordingly, rather than giving the opinion controlling weight, the ALJ afforded it little weight. (R. 20.) However, the ALJ incorporated Dr. Yancey's opinion that Rainey has problems focusing into his RFC determination by including that Rainey may be off task up to five percent of an eight-hour workday. (R. 20.) Prior to assigning weight to the opinion, the ALJ acknowledged Dr. Yancey's treatment of Rainey as her primary care doctor and discussed treatment records dating back to October 2014. (R. 18-19.) The ALJ was not required to recount the description of Rainey's treatment records when evaluating the medical opinion evidence. See Crum v. Comm'r of Soc. Sec., 660 F. App'x 449, 457 (6th Cir. 2016) ("[T]he ALJ did not reproduce the list of these treatment records a second time when she explained why [the treating physician]'s opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion.")

(citing <u>Forrest v. Comm'r of Soc. Sec.</u>, 591 F. App'x 359, 366 (6th Cir. 2014)).

In discussing Dr. Yancey's opinion, the ALJ emphasized that the sole objective basis for the recommendation of "less than sedentary" exertional limitations was the June 2018 MRI of Rainey's lumbar spine, which Dr. Yancey described as showing a "bulging disc" at L4-L5. (R. 19, 570-71.). Yet, as noted by the ALJ, "the MRI report indicates an impression of '[m]ild degenerative disc disease without significant change' since a prior study in October 2014, and with no indication of impingement of the neural spinal canal." (R. 19, 295.) The findings in the MRI report indicated only "mild bulging" at L5, as well as "a left paracentral disc protrusion" at L4 which was present on the previous MRI report from October 2014. (R. 18, 295.) Dr. Yancey did not support her opined restrictions with any other objective findings. (R. 19, 570-73.) Accordingly, the ALJ stated that Dr. Yancey's opinion "appears to be based on a subjective report of limitations rather than any objective clinical findings." (R. 19.) The ALJ also noted that Dr. Yancey's own treatment records, which indicated lower back spasms but no other unusual reports or findings, did not support her recommendation of "less than sedentary" exertional limitations. (R. 19.) The ALJ stated that "[n]either the 'mild

-24-

degenerative disc disease' described on the MRI report, nor
'spasms' on cursory exams in the primary care record, nor any other
medical evidence of record, supports the degree of limitations
offered by [Dr. Yancey]." (R. 19.)

This is not a case where the ALJ completely failed to mention
or consider the treating physician in making an RFC determination,
see Bowen v. Comm'r of Soc. Sec., 478 F.3d 742, 747-49 (6th Cir.
2007), or rejected a treating physician's opinion without
providing any justification for doing so, see Hall v. Comm'r of
Soc. Sec., 148 F. App'x 456, 465-66 (6th Cir. 2005). Rather, the
ALJ explained why Dr. Yancey's opinion was not due controlling
weight and addressed the relevant factors set forth in 20 C.F.R.
§§ 404.1527(c) & 416.927(c). The ALJ acknowledged Dr. Yancey's
status as Rainey's treating physician, additionally noting a lack
of specialization as Rainey's primary care physician. The ALJ's
discussion of Dr. Yancey's treatment records accounted for the
length of the treatment relationship and frequency of examination.
The ALJ also discussed the treatment and kinds of examinations Dr.
Yancey performed and ordered, which covers the nature and extent
of the treatment relationship. In addition, as described above,
the ALJ explained that Dr. Yancey did not offer adequate objective
support for her recommended restrictions and that her opinion was

inconsistent with the medical evidence in the record. Based on the above, the undersigned finds that the ALJ adhered to the requirements of 20 C.F.R. §§ 404.1527(c) & 416.927(c) in evaluating Dr. Yancey's opinion and provided good reasons for affording it little weight.

Rainey also argues that the ALJ erred in affording weight to the opinions of the examining and non-examining state agency consultants. As a preliminary matter, Rainey incorrectly asserts that the ALJ "gave great weight" to the opinions of the examining and non-examining state agency consultants. (ECF No. 19, at 16.) The ALJ gave "moderate weight" to the opinion of Dr. Keown, "only partial to moderate weight" to the opinion of Dr. Wilson, "little to partial weight" to the assessments by the state agency psychological consultants, and "little weight" to the assessments by the state agency medical consultants. (R. 20.) The undersigned finds that the ALJ adhered to the regulations in evaluating these medical opinions and provided adequate reasons for the weight afforded to each. See Jines v. Berryhill, No. 18-1234-TMP, 2019 WL 4644000, at *5 (W.D. Tenn. Sept. 24, 2019) ("In explaining the weight given to a non-treating source, the ALJ only needs to say enough to allow a reviewing court to trace the ALJ's reasoning.")

(citing Stacey v. Comm'r of Soc. Sec., 451 F. App'x 517, 519 (6th Cir. 2011)).

Dr. Keown performed a one-time consultative examination of Rainey in February 2017. (R. 16, 20, 281-83.) The ALJ noted that Dr. Keown's assessment of "no functional limitations" was supported by her examination findings and consistent with both her examination and other evidence in the record, such as Dr. Wilson's observation that Rainey "ambulates normally and without apparent difficulty." (R. 20, 288.) When discussing Dr. Keown's opinion, the ALJ emphasized that her examination findings were unremarkable, indicating negative straight leg raises, 5/5 strength in both hands, arms, and lower extremities, no sensory impairment, full range of motion throughout, and an unremarkable gait with no assistive device used. (R. 16, 281-83.) Additionally, Dr. Keown noted in her report that Rainey reported prior imaging indicating a bulging or herniated disc but "[i]nterestingly, the origin of pain is specified by [Rainey] to be upper left flank about the posterior axillary line." (R. 16, 281.) Dr. Keown assessed left flank pain and opined that Rainey could be expected to sit, stand, walk, lift, or carry without specific restriction or limitation. (R. 16, 282-83.) Deeming this opinion to be supported by the examination findings and consistent with other

-27-

evidence in the record, the ALJ afforded Dr. Keown's opinion "moderate weight." The ALJ adhered to the applicable regulations in evaluating Dr. Keown's opinion and provided adequate reasons for the weight given.

Dr. Wilson also performed a one-time consultative examination of Rainey in February 2017, in which he assessed major depressive disorder and generalized anxiety disorder. (R. 16, 20, 285-90.) The ALJ highlighted Dr. Wilson's observations that Rainey's verbal skills, communication skills, and social skills were good and that her activity level was within normal limits. (R. 16, 289.) Dr. Wilson opined that Rainey was not significantly to mildly limited in her ability to understand and remember, and that Rainey was mildly to moderately limited in her ability to interact with others and her ability to adapt to changes and requirements. (R. 16, 290.) Dr. Wilson additionally opined that in her ability to sustain concentration, persistence, and pace, Rainey was mildly limited with respect to concentration and moderately limited with respect to persistence. (R. 16, 290.) The ALJ noted that Dr. Wilson based these conclusions on his interview, observations, and mental status exam during Rainey's visit. (R. 16, 285-90.) In deciding to afford this opinion "only partial to moderate weight," however, the ALJ explained that Dr. Wilson "appeared to give substantial

weight to [Rainey's] subjective reporting that was not entirely consistent (e.g. noting she had good social skills but seemed somewhat impaired with social activities)." (R. 20.) The ALJ's evaluation of Dr. Wilson's opinion complied with the regulatory requirements and included sufficient explanations for the weight given.

Rainey's challenges to the ALJ's consideration of the opinions rendered by the non-examining state agency consultants lack merit. As stated above, Rainey incorrectly asserts that the ALJ "gave great weight" to the opinions of the non-examining state agency consultants. (ECF No. 19, at 16.) The ALJ gave "little weight" to the assessments by the state agency medical consultants and "little to partial weight" to the assessments by the state agency psychological consultants. (R. 20.) The ALJ found the state agency medical consultants' opinions of "no severe physical impairment" to be inconsistent with the record due to Rainey's history of back pain demonstrated throughout her treatment records. (R. 20.) The ALJ provided greater discussion of the opinions rendered by the state agency psychological consultants, which assessed mental impairments of depression and anxiety causing no more than moderate limitations in one or more domains. (R. 17.) The ALJ noted that the initial psychological assessment

indicated no limitations with understanding and memory but moderate limitations in other areas. (R. 17, 59-61.) However, the psychological assessment on reconsideration indicated no limitations in any area except concentration, persistence, or pace. (R. 17, 20, 87-88.) The ALJ stated that the psychological assessment on reconsideration was entitled to more weight because it was more consistent with the record as a whole, including medical records later submitted. (R. 17, 20, 87-88.)

Rainey challenges the non-examining source opinions on the basis that the state agency consultants "did not have any [medical] records to review" when formulating their assessments. (ECF No. 19, at 15.) According to Rainey, opinions from non-examining sources "who did not have medical records to review . . . are not entitled to weight." (Id. at 12.) However, the non-examining sources reviewed the records from the examinations of Dr. Keown and Dr. Wilson. Rainey provides no legal basis for concluding that non-examining source opinions are categorically not entitled to weight if they rely solely on records from consultative examinations. Rather, Rainey misconstrues Sixth Circuit precedent. Relying on Blackley v. Commissioner of Social Security, 581 F.3d 399 (6th Cir. 2009), Rainey argues that assessments from non-examining sources "made without all the [medical] records" have

"little value" and cannot constitute substantial evidence. (ECF No. 19, at 15.) However, the Sixth Circuit Court of Appeals has held that Blackley does not "provid[e] a blanket prohibition on an ALJ's adoption of a non-examining source opinion, where that source has not reviewed the entire record." Kepke v. Comm'r of Soc. Sec., 636 F. App'x 625, 632 (6th Cir. 2016) (citing Blackley, 581 F.3d at 409). Instead, Blackley stands for the "far more limited" proposition that "before an ALJ accords significant weight to the opinion of a non-examining source who has not reviewed the entire record, the ALJ must give 'some indication' that he 'at least considered' that the source did not review the entire record." Kepke, 636 F. App'x at 632 (quoting Blackley, 581 F.3d at 409). Accordingly, Blackley does not stand for the proposition urged by Rainey, and her reliance on Blackley is misplaced because the ALJ in this case clearly acknowledged that the non-examining state agency consultants reviewed only the assessments of Dr. Keown and Dr. Wilson. (R. 16.) The undersigned finds no reversible error in the ALJ's evaluation of the non-examining source opinions or any of the medical opinions in the record.

Rainey's remaining arguments are similarly unavailing. For example, Rainey argues that the ALJ improperly substituted his own opinions for those of the treating physicians and "cherry-picked"

-31-

among evidence to reach a preferred conclusion. (ECF No. 19, at 13, 18.) The record reflects that the ALJ evaluated and assigned weight to each medical opinion in the record in accordance with the applicable regulations. While Rainey asserts that the ALJ "cherry-picked" evidence, "the same process can be described more neutrally as weighing the evidence." White v. Comm'r of Soc. Sec., 572 F.3d 272, 284 (6th Cir. 2009); see also DeLong v. Comm'r of Soc. Sec., 748 F.3d 723, 726 (6th Cir. 2014) (finding that an allegation of "cherry picking" the record "is seldom successful because crediting it would require a court to re-weigh record evidence."). Rainey also broadly asserts that the medical evidence and opinions demonstrate that she is disabled from the alleged onset date. (ECF No. 19, at 11.) However, if substantial evidence supports the ALJ's determination, the court "may not even inquire whether the record could support a decision the other way." Barker, 40 F.3d at 794. Rather, the court "defer[s] to that decision even in the face of substantial evidence supporting the opposite conclusion." Moruzzi v. Comm'r of Soc. Sec., 759 F. App'x 396, 406 (6th Cir. 2018) (citation omitted). The undersigned finds that the ALJ adhered to requirements of 20 C.F.R. §§ 404.1527(c) & 416.927(c) in evaluating the medical opinion evidence in the record

and that the ALJ's RFC determination is supported by substantial evidence.

### III.   CONCLUSION

For the reasons above, the Commissioner's decision is AFFIRMED.

IT IS SO ORDERED.

s/ Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

August 11, 2021
Date